Freeman, J.,
delivered the opinion of the court.
This bill is filed by J. E. Deaderick, Joseph S-Rhea, Robert L. Blair, -W. C. Slemons, and John B. *524 McLin, as Elders of the Presbyterian Church at Jones-boro,- who sue .on behalf of themselves and the congregation of said Presbyterian Church against J. L. Lampson, John H. Fain, Andrew J. Brown, John W. Mathes, and David J. Gibson, who, as the bill says, are now acting Elders of the congregation occupying the church building, and who are denominated “Quasi Trustees” of this congregation.
The question presented in the bill for our decision is as to the right of the contesting parties to the possession of the church building, and the prayer of bill is for a decree declaring complainants and those they represent, the true Jonesboro Presbyterian Church, restoring to them their house of worship, and vesting them with title in fee thereto, and for rents during the time they have been deprived of its use, and for a restoration of the Church archives and records, and for general relief.
A demurrer was filed by defendants on various grounds, which was overruled by the Chancellor, from which decree he allowed an appeal to this court. It appears from the bill, the charges of which must be taken as admitted by the demurrer, that about the year 1847 the congregation composing the Presbyterian Church at Jonesboro erected the building in controversy on a lot in said town, at a cost of $6,420.27, paying this sum by voluntary contributions. This congregation continued together as one body harmoniously down to the close of the late war. At this time, and for a period of two years or more, the congregation had engaged the services of a minister, the *525 Rev. Mr. Tadlock, with no dissenting voice as to his employment in that capacity.
The hill alleges that very soon after the close of the war the loyal portion of the congregation, including two out of the three remaining Elders, but a clear minority of the membership of the Church, on account of difference of political sentiment, procured the discharge of Mr. Tadlock from his charge of the Church, but assuming a power, as is insisted, nowhere granted in the Constitution of the Presbyterian Church, took possession of the church building, and called a Rev. Mr. Waterbury, a minister from New York, to the charge of the congregation.
It is then alleged that the present possession of the church building is held under this violent and illegal seizure; that at the time of said seizure of the church building the mob was the prevailing power in this community, violence and outrage the order of the day, and the majority of the congregation who had almost all sympathized with the late rebellion, had no chance to assert their rights, and would have been prevented by force and violence if they had attempted to do so. They say, therefore, they were compelled, by these circumstances surrounding them, to submit in silence.
In this connection it is shown that a petition was drawn up and signed by seventy out of the one hundred members of the Church, presented to the Elders of the Church then residing in the county, requesting that the whole congregation be called together, after due notice, that they might vote upon the question *526 ■of their ecclesiastical relations. It seems that this petition was for the purpose of having the decision of the body as to whether it would remain with the organization known as the United Synod of the Presbyterian Church, which had in 1864, perhaps, united with the Old School Presbyterian Church in the South, and formed by ■ the union General Assembly of the Presbyterian Church in the United States; or whether the congregation would reconnect itself with the New School Presbytei’ian Church North, from which the southern churches had separated in 1857, and formed the Ubed Synod, of the Presbyterian Church in the United States. To this last body, in 1857 or 1858, the Jonesboro Church had unanimously voted to connect itself, and had kept up and continued that connection until ■ the union of the body with the Old School Presbyterian Assembly in 1864.
In reply to this petition it is alleged that the minority, having control of the building, positively refused to call such meeting. It is then charged that soon after this the minority united with others under their own signatures, in a published call, in the newspapers of Jonesboro, on the mob, to come- to their aid in excluding the majority from what they deem their rights. This paper is filed as an exhibit, and as exhibiting more graphically than any statement of it can do, the animus of the parties, and the state of things then existing — a sad picture of human frailty when controlled by excited passions — is here copied, and is as follows:

*527
“To the loyal people of Washington oounty:

"Whereas, various attempts have been made by the late rebel preachers and their sympathizers to obtain possession of the church property in the town of Jones-boro, now in the possession of, the loyal people; and well knowing that their organizations are supported alone by those who lately attempted to destroy our government, and that their distinctive ideas are identical with those that caused the late bloody rebellion, we respectfully invite all loyal people, whether church members or not, to meet at the court house ■ in Jones-boro, on Saturday, the 16th inst., to take action in the premises.”
This remarkable document is signed by twenty-two names, among them two of whom appear to have been Elders of the Presbyterian Church, and who went with this minority of the membership.
It is further shown in the bill that the minority, without notice to the majority, or any participation on their part in the act, have, by a vote, assumed to carry the Church back to the New School Presbyte-. rian Church North, thus rescinding the unanimous action of the body heretofore referred to, connecting itself with the United Synod of the Presbyterian Church. It is insisted that this action of the minority is nugatory and void, and that the status of the Jonesboro Church remains where the former unanimous vote had placed it. After various efforts of-compromise the majority organized again, as they say, the Jonesboro Church, not as a secession from said *528 Church, but as the Church itself, adhering to the relations which the free and unanimous vote of the congregation had adopted, and which they claim has not been legally changed. They claim to be in law and fact the Jonesboro Presbyterian Church, and as such entitled to the church building and archives.
In addition to the above, it appears that a proposition for a compromise was submitted by the majority, the terms of which need not be here stated, to which the minority send a reply commencing by saying that a paper has been presented to the officers of our Church, and we would reply to it respectfully, etc., concluding with a proposition, inviting the majority to join with them in maintaining a Presbyterian Christianity in Jonesboro on the following terms, that is, “that we propose that those of you who are officers be received as officers into our connection if you so desire, and all the members upon the simple recommendation of these officers.”
These statements are sufficient to present the questions to be decided, and are treated for the purpose of this opinion as admitted to be true by the demurrer of respondents. It now becomes our duty to declare the legal rights of the parties resulting from this state of facts.
No question arises on the title of the parties to this controversy, growing out of the terms of the original deed or conveyance of the property. It must, therefore, be assumed, as may be gathered from the bill, that the property was originally vested in “the Jonesboro Presbyterian Church.” Not using the term *529 Church iu a strictly ecclesiastical sense, as it is understood by many, meaning perhaps the entire organized body of a denomination, organized under a general system of government, consisting of numerous congregations, but in - the simple sense of a congregation of Christians, - known as Presbyterians, organized and officered according to the peculiar regulations of that denomination. This body, then in existence with its officers, was the original owner, at any rate in a court of equity, of the property in controversy. This body, in other words, was entitled to the property as beneficiaries, so to speak, to be used for the purpose and objects contemplated in its original, purchase, or donation, if it was a donation, and for such purposes was entitled to its possession and control. The objects" of the ownership of this property clearly appear, and are that it was to be used by this body at will, for worship, the preaching of the gospel, and for the convenience and accommodation of the body in all its meetings of whatever character, in transacting the usual business of such a body, and 'in furtherance of the general objects of the organization. The right to possess and to use the building erected by the contributions of the individual membership, was not in any particular individual, or single member of this body, or any part, however large or small, but in the collective body, known as the Church; that is the officers and membership, making a unit. This is clearly deducible from the very nature and character of such an organization, and the erection of a church building under the circumstances by the same. In *530 other words, by the purchase or obtaining the ground, and erection thereon of the building, it was necessarily implied and fairly understood as the meaning of this act, and therefore the compact of the parties, that the building should be used for the purposes of the Presbyterian congregation as organized, and as it might continue to be in the future and for all time to come. For it may be remarked that such organizations are self-perpetuating, and one leading purpose of the organization is that others shall be added to the body by voluntary connection with it, and such parties by such connection become entitled to all the rights and privileges belonging to an original member, and brings himself under the obligations that bind the body, or members of the body to which he attaches himself. With these principles in view, nothing can be clearer than that a minority could not exclude a majority, arbitrarily, from the enjoyment of the property, the use of which was intended for all in the capacity, and as an organization, for the purposes of the organization, and in the furtherance of' its beneficent ends. If such an act is attempted, it must not be on the principle of a right in one part of the collective body to exclude the other from the possession and use of the common property, as a part of such body, but it would have to appear that the parties so sought to be excluded had in some way ceased to be a part of the body in accordance with established laws and usages of the organization. In other words, that by some act in accordance with law of the body, these parties had been excluded from and ceased to. *531 constitute a part of the Presbyterian Church at Jones-boro.
We take it -that these principles will be conceded by all as correct and substantially sound. We then turn to the facts of the bill, and see if any such state of things exists as would authorize this court to say that the complainants have ceased to be a part of the body known as Jonesboro Presbyterian Church, or have lost their identity and rights as such integral part of this body.
We then look for a moment at the constitution and laws of this body of Christians known as Presbyterians, as found in the constitution of the same, which is its organic law, where we find that the Church, as therein defined, “consists of all those persons in every nation, together with their children, who make profession ’ of the holy religion of Christ, and of submission to his laws. Form of Government, page 347, ch. 7, sec. 2. But as this multitude could not meet together in one place, it is declared that they should be divided into particular churches, which last is defined as follows: “A particular church consists of a number of professing Christians, with their offspring, voluntarily associated together for divine worship and godly living, agreeably to the Holy Scriptures, and submitting to a certain form of government.” . Chapter three declares the officers of the organization to be Bishops or Pastors, and representatives of the people, usually styled Ruling Elders and Dea-' cons. Ruling Elders are representatives of the people, chosen by them for the purpose of exercising govern *532 ment and discipline, in conjunction with the pastors or ministers. The Pastor and Ruling Elders compose what is called the “ Church Session.” This session is charged with maintaining the spiritual government of the congregation, for which they have the power to inquire into the knowledge and Christian conduct of the members, to call before them offenders, to receive members into the Church, to admonish, to rebuke, to suspend or exclude from the sacraments those who are found to deserve censure.” In a word, the pastor and these elders, the latter representing the congregation, are the official governing body of the particular Church in the administration of its affairs. In exercising this governing power, rules are prescribed for the action of this body, and among others, in excluding a member the primary steps are that a charge shall be presented and the party summoned and furnished with a copy of the charges.
In pursuance of the rules we have cited, in order to make out the case that the majority, represented by the complainants in this case, had been, in accordance with the law of the body, excluded from membership after notice and the means of defense, action should be shown to have been taken in accordance with the law of the Church in which such judgment of exclusion had been declared. No such fact appears in the record. On the contrary, it simply appears that on account of the political opinions held by them, they have been excluded from the occupation and enjoyment of the property of the body of which they made at the time an integral part, have *533 been kept out, and even a public assemblage of political opponents, in time of fierce excitement and extreme bitterness of feeling, invoked to intimidate them from seeking redress of their wrongs or prosecuting their rights. We need not go into a detail of the faults on this point, it suffices to say that it clearly appears from the bill and exhibits that a small minority have assumed to be the Jonesboro Church, and as such have, without pretense of forms of law, and in utter disregard of fraternal and Christian ties and obligations, by might and not by right, excluded their brethren from the enjoyment of that which was their own; and what is a sad reflection, but one forced on us by the facts of the case, we have the spectacle of men professing the religion of Him who taught only lessons of peace, that charity or love was above all faith or knowledge, and the principle of brotherhood among his disciples a paramount and controling influence, yet have men professing to be his followers made political opinions and political hates paramount to all the teachings of their Master, and under such influences trampled the rights of their brethren and feelings under foot as matters unworthy of consideration. '
This action of the respondents, affecting and in-fracting the rights of property in the church building, which belong to every member of the organization, as an integral part of the body, is and must necessarily be the subject of redress in civil courts. No other body or judicatory could give the remedy. Ecclesiastical courts could only inflict spiritual censures *534 or pass judgment on the mosal aspects of the question, or if they should determine and adjudge the right to possession in favor of one part as against the other, they are utterly powerless to enforce their judgments; and such a judgment would at most be but an authoritative expression of opinion, but would settle effectually the rights of no one. We therefore hold that the action of the parties in possession of the church building is without any warrant in law, is in violation of the rights of the complainants, and can not be permitted to continue, or be sustained when the question is presented before a civil court, and its powers invoked to redress the wrong.
In accordance with this view we hold that the entire action of the parties in possession from the time of the exclusion of the majority as represented by complainants, is absolutely unauthorized and void, that this usurping minority in possession is not the Jones-boro Church, nor can it make itself so by any action of its own, by resolution or organization. It follows necessarily, to go no farther, that the court would be bound to treat all the acts of this body as ineffectual in fixing rights, or for any purpose, and that complainants are entitled, on this view of the case, to be restored to their original status, and to the enjoyment of precisely the same rights which they enjoyed at the time the series of illegal acts commenced.
In taking cognizance of such a question as is presented in this case, the civil courts do not undertake to . revise or correct the action of the ecclesiastical tribunals, established in the various denominations of *535 Christians in our country, so far' as the action of such tribunals, within their sphere of operation, is upon the individuals composing their bodies, and affects their individual relation to the body. They have,' by voluntarily connecting themselves with it, bound themselves to abide by the decisions 'of its tribunals, in accordance with its established laws and usages. How far a civil court might interfere to inquire into the regularity of the action of ecclesiastical tribunals, when it is claimed that such action has not been in accordance with their own laws, in matters of discipline, we need not here inquire, as the question is not presented in this form before us. The rule is thus laid down, and we think correctly, by Judge Robertson, ’of the Supreme Court of Kentucky, in the case of Gartin v. Penick, 9th Am. Law Reg., 213, that “ while the general desire of courts of law is to avoid ecclesiastical or spiritual questions, they find it impossible to do so. If a body of men have wrongful possession of a church, or of a sum of money, on the pretense, for example, that they are the religious body to which the money or the building was destined, their opponents have no way of redressing the wrong and vindicating their own right, except by appealing to the civil tribunals of the country, and civil tribunals have no means of doing justice in such cases, except by investigating into differences of doctrine, discipline, or practice, which, to the litigants, may be religious differences, but to the Judge are mere matters of fact bearing on a question of civil right.” He then adds, that while courts could not “ control or mould the *536 faith or doctrines of the Church/’ nor settle questions of orthodoxy, yet “so far as the identity of the respective claimants with the beneficiary to whom the church property was dedicated, may be affected by their doctrines, or by the acts of the General Assembly in that ease, the essential coincidence the doctrines and the legal effect of those acts must necessarily be considered for the purpose of deciding the question of title to the property. These principles will sustain the jurisdiction of civil courts in cases like the present, and the views we have above expressed.
It may be proper to notice here an argument ably and ingeniously presented by the learned counsel who argued the case for respondents, that is, that if the action of the minority is unlawful, the parties affected by it have their redress in the ecclesiastical tribunals by appeal. But we answer to that, that an appeal would properly lie from any action involving administration of doctrine or discipline on the part of the Church, but it must be from the action of the body, or its ruling officers. But the minority in this case, in the first place, have taken no action in discipline or doctrine as to the complainants, nor has there been any trial before any ecclesiastical tribunal to be appealed from. In the next place, this minority is not the Jonesboro Church, unless we can assume that a small part is the whole of such a body, or that a usurping minority can, by violence, and of their own will, constitute themselves the Church at Jonesboro, to the exclusion of the rights of the majority. In a word, unless we hold this minority have become the *537 Jonesboro Church, they could take no action that could affect rightfully the majority body, or any member of the Church who did not choose to submit to their decrees. There was, therefore, no action of Jonesboro Church, or its constituted authorites, from which any party affected, or sought to be affected thereby, could be -required to appeal to any- other tribunal.
We therefore hold that all the action of the party in possession, as a body or assumed organization, from the time of the forced separation of the original body, is not the action of Jonesboro Church, but the action of a self-constituted body, assuming to be the Church, and is utterly void, so far as its binding force on the Church as a body is concerned. Second, that the acts alleged of- violence and force, of whatever character they may be, which excluded the complainants from possession and enjoyment of the church property, .were illegal, unauthorized, and in violence of the rights of such members so debarred, and ’it is the duty and right of civil courts to redress the wrong by restoring the parties complaining to the enjoyment of these rights, and place them, in the precise position in which they were at the time the wrongs commenced.
Third, that Jonesboro Presbyterian Church remains precisely as it was, with its ecclesiastical connections unaffected, and its rights of property in nowise changed by the unlawful conduct of the usurping body, and that no . act of such body could any way bind the Church as such. It also follows that the members of the body at the time of the usurpation, who may have been engaged in these wrongs as individuals, will *538 still constitute a part of the body of Jonesboro Church, but solely by reason of their individual connection originally with said body, they not having been excluded from membership by any authoritative act of the Church or its ruling officers, or power having such authority, nor is this court authorized to declare that these usui’ping members, as individuals, have forfeited their membership in said body. In other words, the law will undo all the wrong that has been done, and place the parties precisely as if no such acts had taken place.
So far as the organized body now in possession of the Church building is concerned as a separate organization, as they claim to be, it has no rights whatever in said building, that is as an ecclesiastical organization ; nor is any one composing such organization, by reason of his or her subsequent connection with said body, a member of Jonesboro Church. But if a member, it is by reason of his lawful connection with the body at the time of separation, and as one of the original members thereof. And in conclusion we declare that the complainants and the members they represent as members of the organization, are, as against the assumed and usurping organization, claiming possession of the buildings and archives, entitled to have the possession of both buildings and archives restored to Jonesboro Church, to which they belonged at the time of their deprivation.
The decree of the Chancellor overruling the demurrer is affirmed, with costs, and the case remanded lor answer- and further proceedings.